CURTIS H. ASHFORD *v.* THOS. COOK & SON (BANKERS), LTD., AND THOS. COOK & SON, INC.

No. 4874.

JUNE 12, 1970.

RICHARDSON, C.J., MARUMOTO, ABE, LEVINSON AND KOBAYASHI, JJ.

OPINION OF THE COURT BY ABE, J.

On June 24, 1964, defendant, Thos. Cook & Son (Bankers), Ltd., sold and delivered travelers checks totaling $25,000 to Mr. and Mrs. Kochton at their home in the suburb of Chicago, Illinois. Mr. Kochton was at home at the time of delivery and he signed his name to one-half of the checks on the lower left hand corner in the presence of an agent for Thomas Cook & Son (Bankers), Ltd., as

required by its regulation. However, Mrs. Kochton was not at home and her unsigned travelers checks for the amount of $12,500 were left with Mr. Kochton. In spite of an instruction to have the checks signed as provided before her departure, Mrs. Kochton failed to do so and unsigned travelers checks amounting to $11,900 were stolen from her in Tahiti in July, 1964.

On May 3, 1966, Curtis H. Ashford, plaintiff, who was then living in Tahiti, inquired of the Indo-China Bank, the only bank at Papeete, Tahiti, whether he could exchange New Zealand pounds and Polynesian francs for United States dollars and was informed that he could not. He returned to his boat to have lunch. Shortly thereafter a young Tahitian male came on board his boat and stated that he had been informed that plaintiff desired to exchange Polynesian francs for United States dollars and suggested that plaintiff purchase travelers checks. Plaintiff inquired whether that was possible because when he was informed at the bank that he couldn't make the exchange of Polynesian francs for United States dollars he had assumed he couldn't buy travelers checks with francs. When plaintiff was assured that he could purchase travelers checks, assuming that the Tahitian was connected with the bank, he asked if he should go to the bank during the noon hour. The Tahitian told plaintiff that was not necessary and that he and a director from the bank would come to the boat to consummate the transaction.

Subsequently the Tahitian returned to plaintiff's boat with a European male, who introduced himself as a Cook's agent and flashed an identification card. Thereafter the transaction was consummated[1] whereby plaintiff paid Polynesian francs and New Zealand pounds valued between $8,450 to $8,600 for United States travelers checks

---

[1] Plaintiff signed on the lower left hand corner of each check.

with face value of $8,300. The overcharge, according to the "agent", was for fee, premium and difference in exchange rate.

Thereafter he remained in Tahiti for a short time before leaving for Hawaii. After coming to Hawaii, plaintiff kept the travelers checks until January 1967, when he deposited them with the Liberty Bank in Honolulu. When the checks were forwarded to New York for collection, they were not honored and Liberty Bank debited plaintiff's account.

Plaintiff brought this action against defendants Thos. Cook & Son (Bankers), Ltd., and Thos. Cook & Son, Inc. The case was tried by a jury and after the jury returned a verdict, the trial court entered judgment for plaintiff for the sum of $8,300 plus interest, costs, etc., or $9,609.06. Defendants appealed.

## I.

Defendants contend that the trial court erred in holding the travelers checks to be negotiable instruments when they were stolen.

As acknowledged by all the parties, the Uniform Commercial Code, HRS C. 490, became effective on January 1, 1967, about eight months after the plaintiff acquired the checks and is not applicable here. The defendants argue that the checks had not been delivered and under the Negotiable Instruments Law the defense of non-delivery of an incompleted instrument was applicable in this case. We cannot agree. The agent intended and did transfer possession to Mr. Kochton and delivery of the checks was completed. However, we are not concerned with this issue.

Each of the travelers checks involved here contains the following on its face:

### TRAVELERS CHEQUE FOR ONE HUNDRED DOLLARS

------------------------------------------------------------------------

Counter-sign here in the presence of paying Cashier

Thos. Cook & Son (Bankers) Ltd
 New York Agency.
Upon presentation of this cheque countersigned by the person whose signature is shown below will
Pay to the Order of................................................................
Signature of holder

------------------------------------------------------------------------

This cheque is redeemable by Thos. Cook
& Son (Bankers) Ltd. New York Agency.

Revised Laws of Hawaii 1955, § 197-1, the Uniform Negotiable Instruments Act (hereinafter referred to as Negotiable Instruments Law or NIL) reads:

> *"Form of negotiable instrument.* An instrument to be negotiable must conform to the following requirements:
>
> > (a) It must be in writing and signed by the maker or drawer;
> >
> > (b) Must contain an unconditional promise or order to pay a sum certain in money;
> >
> > (c) Must be payable on demand, or at a fixed or determinable future time;
> >
> > (d) Must be payable to order or to bearer; and
> >
> > (e) Where the instrument is addressed to a drawee, he must be named or otherwise indicated therein with reasonable certainty."

It has been conceded by scholars that travelers checks in the various forms do not fall squarely within the purview of the Negotiable Instruments Law.[2] This may be

------

[2] Hawkland, *American Travelers Checks*, 84 Banking L.J. 377 (1967); Ellinger, *Travellers' Cheques and the Law*, 19 U. Toronto L.J. 133 (1969); *Negotiability of Travelers Checks*, 47 Yale L.J. 470.

because the travelers check industry was in its infancy when the Negotiable Instruments Law was enacted.[3]

Courts of other jurisdictions have applied the NIL to travelers checks and have arrived at conflicting results where a thief stole blank travelers checks, signed and countersigned them and negotiated to third parties for value and without notice. In *American Express Co.* v. *Anadarko Bank & Trust Co.,* 179 Okla. 606, 67 P.2d 55 (1937), the Oklahoma court held that American Express Co. was liable for the checks because the purchaser's signature was not necessary to make the checks complete and as the stolen checks were completed negotiable instruments, the issuer was liable to the bona fide holder. On the other hand, in *City National Bank of Galveston* v. *American Express Co.,* 16 S.W.2d 278 (Tex. Com. App. 1929) the court held that American Express Co. was not liable for travelers checks as they were not completed when stolen because the signature of the purchaser had not been affixed and as they had not been delivered they were not valid contracts even in the hands of a holder in due course. *See also, First Nat. City Bank of New York* v. *Frederics-Helton Trav. Serv., Inc.,* 209 N.Y.S.2d 704 (S. Ct. N.Y. 1961).

We believe we should take a more realistic and less technical approach and recognize that travelers checks have been accepted by the public as a medium of exchange and that they have acquired negotiable characteristics by established custom and general acceptance by the public rather than by conformity with provisions of the Negoti-

---

[3] *Negotiability of Travelers Checks,* 47 Yale L.J. 470, 475, footnote 29, mentions that travelers checks appeared in 1891, five years prior to the acceptance of the NIL by the National Conference of Commissioners on Uniform State Laws, but not until the turn of the century was there a large circulation of the checks.

able Instruments Law[4] or of the Uniform Commercial Code.[5]

It is common knowledge that any establishment issuing travelers checks intends its checks to be readily and freely passable from one person to another as money. This is not only intended, but it is widely advertised that travelers checks are readily accepted in commerce as money and that they are safer. The public is made to believe that travelers checks are a substitute for money, a medium of exchange, which are self-identifying and accepted everywhere, but, unlike currency, they can be carried without danger of loss or theft because of the protective device of signature and countersignature.

We believe that if travelers checks are intended by the issuer and accepted by the public as a medium of exchange to take the place of money, they should be subjected to the same rules of law applicable to money under like circumstances.

The general rule is that when one in good faith acquires possession of stolen money for valuable consideration his title is superior to that of the true owner. *Ohio Casualty Ins. Co.* v. *Smith,* 297 F.2d 265 (7th Cir. 1962) ; *First Nat'l Bank of Birmingham, Ala.* v. *Gilbert & Clay,* 123 La: 845, 49 So. 593 (1909).

The United States Supreme Court in *Cooke* v. *United*

---

[4] Other NIL sections applicable to travelers checks are: § 1, form of negotiability; § 5, additional provisions not affecting negotiability; § 6, omissions; § 14, blanks and when they may be filled; § 15, incomplete instrument not delivered; § 16, delivery; § 30, negotiation; § 52, holder-in-due-course.

[5] The following UCC provisions may be applied to the travelers checks: 3-104 on form of a negotiable instrument; 3-104, comment 4. states that travelers checks are covered by UCC; 3-112 on terms and omissions not affecting negotiability; 3-115 on incomplete instruments; 3-407 on alterations; 3-201 on transfer of an instrument; 3-202 on negotiation; 3-102(1) (a) defining "issue" of an instrument; 3-111 defining "bearer instrument"; 1-102(2) (b), negotiability by custom and usage; 3-104, comment 1, clarifies section 1 which allows negotiability by statutes or by judicial decision.

*States,* 91 U.S. 389 (1875) held that inasmuch as treasury notes were intended to circulate and take the place of money, even though they were stolen and placed unlawfully in circulation, the United States was required to pay bona fide holders of such notes. At pages 403-04, the court said:

> "The notes were perfect and complete as soon as printed. They did not require the signature of any officer. As soon as they had received the impression of all the plates and dies necessary to perfect their form, they were ready for circulation and use. In this respect they did not differ from the coins of the mint when fully stamped and prepared for issue. Coin is the money of commerce; and circulates from hand to hand as such. These notes represent the promises of the government to pay money, and were intended to circulate and take the place of money, to some extent, for commercial purposes."

We therefore hold that travelers checks upon being printed become a medium of exchange or acquire negotiable characteristics and all the risk of theft is with the issuer. The issuer is thus liable to any bona fide holder of stolen travelers checks who has paid valuable consideration.

## II.

Was plaintiff a bona fide purchaser of stolen checks?

The defendants contend that the trial judge erred in refusing to give the defendants' requested instruction No. 1 which reads:

> "Before Plaintiff can qualify as a holder in due course and recover against Defendants, you must be satisfied by a preponderance of the evidence that he paid good value for the traveler's checks. You must also be satisfied by a preponderance of the evidence that he purchased these instruments in good faith with-

out notice of any irregularities or defects in the title of the person from whom he acquired them.

"If you find from the evidence that Plaintiff acquired these traveler's checks under suspicious circumstances and that he had an opportunity to inquire at the local bank or elsewhere as to the validity of these instruments but wilfully refrained from such inquiry, then such wilful ignorance is the equivalent of actual knowledge or bad faith which deprives Plaintiff of being a holder in due course and is a complete defense for Defendants in this case."

On this issue the trial judge charged the jury as follows:

"Where a person purchases a negotiable instrument in good faith for value, that is to say paying a proper price therefor, and has no knowledge that there is any defect or irregularity in connection with the issuances of said negotiable instrument such as travelers checks in this case, such a person is known in the law as a bona fide purchaser for value.

"In this connection you are further instructed that if you find and believe from the evidence in this case that the plaintiff was a bona fide purchaser for value of the travelers checks in question, then you are specifically instructed that the fact that these travelers checks may have been stolen does not affect the negotiability of these checks and plaintiff is entitled to judgment against the defendants.

"Before plaintiff can qualify as a bona fide purchaser for value and recover against defendants, you must be satisfied by a preponderance of the evidence that he paid good value for the travelers checks. You must also be satisfied by a preponderance of the evidence that he purchased these instruments in good faith without notice of any irregularities or defects in

the title of the person from whom he acquired them.

"Good faith as a requisite of being a bona fide purchaser for value entails the absence of bad faith and of guilty knowledge or notice. The requirement of 'good faith' generally means that the transaction was honestly conceived and consummated without collusion, fraud, knowledge of fraud, or intent to assist in the perpetration of a fraudulent or otherwise unlawful design. To be a purchaser in good faith means that at the time one takes an instrument, he acts honestly and fairly under the facts and circumstances within his knowledge with respect to the rights of all prior parties and in a manner free from the taint of any illegality. A thing is done in good faith when it is in fact done honestly whether it is done negligently or not.

"Bad faith is a lack of fair dealing by which the taker of the instrument obtains an unfair advantage. The question is one of fraud on the part of the taker. It is generally stated that the test of bad faith is not one of prudence, due care, negligence, diligence, or failure to inquire, but knowledge of facts which rendered the taking dishonest. To constitute evidence of bad faith, the facts known to the taker must be such as to reasonably form the basis for an inference that in acquiring the instrument with knowledge of such facts, he acted in dishonest disregard of the rights of the defendant.

"While knowledge of facts sufficient to cause one of ordinary prudence to make inquiry is not evidence of bad faith, a purchaser may not purposely refrain from making inquiry which would result in knowledge of a defense. Willful ignorance is the equivalent of actual knowledge and bad faith. Bad faith is not mere carelessness. It is nothing less than guilty knowledge or willful ignorance.

"To show knowledge of such facts that the taking would amount to bad faith, it is not necessary to show knowledge of the exact fraud that was practiced upon the maker. It is sufficient if the facts within knowledge tend to show that there was something wrong with the transaction. . .

"There is no affirmative duty of inquiry on the part of one taking a negotiable instrument and there is no constructive notice from circumstances unless they are so strong that if ignored they will establish bad faith on the part of the purchaser.

"Nevertheless, suspicious circumstances known to the person taking the instrument, or the knowledge of facts which would have put the ordinary man on inquiry, may constitute evidence of bad faith if the holder believed that there was some defect or infirmity in the paper or that investigation would disclose such."

Assuming arguendo that defendants' requested instruction No. 1 correctly stated the law, we are satisfied that the charge given by the trial judge correctly and fully covered this issue and his refusal to give the requested instruction was not error. *Gibo* v. *City and County*, 51 Haw. 299, 304, 459 P.2d 198 (1969); *Nawelo* v. *Von Hamm-Young Co.*, 21 Haw. 644 (1913).

The defendants further contend that under facts[6] of the case the trial judge should have as a matter of law ruled that plaintiff was not a holder in due course.

We disagree with the defendants. The trial judge correctly submitted this issue to the jury as it was a factual issue to be decided by the jury. The jury found the plain-

---

[6] Defendants contend that: "Plaintiff was under a duty to inquire at the local bank or elsewhere in Papeete as to the validity of these instruments and the authority of the European stranger. Upon making inquiry he would certainly have learned that no Thos. Cook & Son agency existed in Tahiti and this would have remedied the situation. Failure to do so on Plaintiffs part would appear to bar him from due course status as a matter of law."

tiff to be a bona fide purchaser for value of the stolen checks and as its finding is supported by substantial evidence it is not for this court to set aside that finding. *Maki* v. *City and County,* 33 Haw. 167 (1934); *Hurd-Pohlmann Co.* v. *Sugita,* 32 Haw. 577 (1932).

The plaintiff as a bona fide purchaser acquired good title to the stolen checks and the defendants were liable for the face value of the checks.

Further, in this case if the agent of the defendants had seen to it that Mrs. Kochton placed her signature as the regulation of the issuer required and/or had Mrs. Kochton signed the checks as required, the plaintiff would not have purchased the checks. The failure of the defendants and Mrs. Kochton to carry out these requirements led to the purchase. Equity is with the plaintiff and he should not be compelled to take the loss because of the fault of other parties.

Affirmed.

*W. Patrick O'Connor* (*A. William Barlow* with him on the briefs) for defendants-appellants.

*Stuart M. Cowan* (*Greenstein & Cowan* of counsel) for plaintiff-appellee.